## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
GERONE WRIGHT,                    :    Civil Action No. 06-892(NLH)
          Plaintiff,             :
                                 :
      v.                          :    OPINION
                                 :
CITY OF BRIDGETON,               :
et al.,                           :
          Defendants.            :
```

**APPEARANCES:**

Gerone Wright
P.O. Box 220
Norma, NJ 08347

 *Pro Se*

Susanna J. Morris, Esquire
Budd Larner, PC
1939 Route 70 East
Suite 100
Cherry Hill, NJ 08003

 *Attorney for Defendants*

**HILLMAN**, District Judge

## I. INTRODUCTION

 This matter has come before the Court on Defendants' motion for summary judgment on Plaintiff's civil rights and state law claims against them.  Plaintiff has not opposed this motion.  For the reasons expressed below, Defendants' motion will be granted.

## II. BACKGROUND

 On March 23, 2006, Plaintiff, Gerone Wright, *pro se*, filed a five-count Complaint against Defendants City of Bridgeton, City of Bridgeton Police Department, Officer McGuigan, and Officer Fox.  Plaintiff's Complaint arises out of his arrest on January

22, 2005 by Officers McGuigan and Fox.  Plaintiff alleges the following causes of action: Count One - violation of Plaintiff's rights under the New Jersey Constitution; Count Two - assault and battery; Count Three - negligence; Count Four - "protection from unfair action by government interfaced with wrongful arrest"; and Count Five - violations of Plaintiff's Fourth, Fifth, and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983.

Defendants have filed the instant motion for summary judgment.  Plaintiff has not opposed the motion.

### III.  UNDISPUTED FACTS[1]

On January 22, 2005, Plaintiff, his girlfriend Brenda Wilson, and her son Aaron Wilson were living at 131 Bridgeton Avenue, Bridgeton, New Jersey.  (See Plaintiff's deposition at p. 8, lines 18-23, Exhibit B.)  Shortly before 4:00 p.m. on January 22, Plaintiff and Ms. Wilson engaged in a verbal dispute. (Exhibit B, p. 14, line 25, and p. 15, lines 1-21.)  This dispute was overheard by Aaron Wilson and Ms. Wilson's daughter, Azure Wilson, when Brenda Wilson and Azure were speaking on the phone.

---

[1] Pursuant to Local Civil Rule 7.1(d)(2), Plaintiffs' opposition to Defendants' motion for summary judgment was due June 22, 2006.  Plaintiff has not filed an opposition.  Because Defendants' motion for summary judgment is unopposed, the Court will "treat all facts properly supported by the movant[s] to be uncontroverted."  Brandon v. Warden, No. State Prison, 2006 WL 1128721, *3 (D.N.J. 2006).  Accordingly, the Court will adopt Defendants' recitation of the facts.

(Exhibit B, p. 17, lines 15-25, and p. 18, lines 1-8.)  Shortly after the phone call was concluded, Plaintiff left the home, and as he did so, he saw Azure Wilson and Aaron Wilson standing on the curb outside his home.  (Exhibit B, p. 20, lines 23-25, and p. 21, lines 1-3.)  Plaintiff contends that Aaron and Azure Wilson were yelling obscenities at him, and that in particular Aaron was yelling to Plaintiff that Plaintiff had struck Aaron's mother.  (Exhibit B, p. 21, lines 1-14.)  Apparently Aaron Wilson believed this because he thought he had heard Plaintiff slap Ms. Wilson, and because he heard her crying.  (Exhibit B, p. 21, lines 15-21.)

At 3:52 p.m., Aaron Wilson contacted the Cumberland County 911 Center, which transferred the call to the Bridgeton Police Department.  At that time, Mr. Wilson advised the dispatcher that a domestic violence incident was occurring at 131 Bridgeton Avenue, and that Gerone Wright had hit his mother, Brenda Wilson. (See Exhibit C, a CD1 containing the telephone and radio transmission pertaining to the domestic violence call and arrest of Gerone Wright, and see Exhibit D Affidavit of Lt. Burl Kimble regarding the CD.)  Patrolmen McGuigan and Fox were dispatched to the domestic violence call at 131 Bridgeton Avenue.  (Exhibits B and C, and see Exhibit E, Investigation Report of Patrolman McGuigan.)  As Plaintiff was exiting the premises, he contends that a dark colored SUV pulled up in front of his house, and an

3

individual in dark attire walked up to his porch and began to ask him questions.  (Exhibit B, p. 24, lines 22-25; p. 25; and p. 26, lines 1-12.)  Although Plaintiff contends he did not realize the individual was a police officer, he acknowledges that the individual asked him a series of questions to which he responded.  Specifically, Plaintiff recalled that he was asked by the individual, who he later identified as Patrolman McGuigan, whether he was Gerone Wright, to which he responded "yes." (Exhibit B, p. 26, line 25, and p. 27, lines 1-8.)  Patrolman McGuigan then asked Plaintiff if he lived at the house, and in response Plaintiff responded that he was the property owner. (Exhibit B, p. 27, lines 9-12.)  Patrolman McGuigan asked Plaintiff if there was a problem at the house, and Plaintiff told him "no."  (Exhibit B, p. 27, lines 13-25.)  Plaintiff recalls that he was then asked whether there was someone inside the house, and that this person advised him that he needed to speak with that individual.  (Exhibit B, p. 28, lines 4-7.)  In addition, although Plaintiff denies that he was told by the officer that the Police Department had received a report of domestic violence occurring at the house, he did admit that he was told by Patrolman McGuigan that "they had received a call stating there was a problem and he needed to get into the house." (Exhibit B, p. 28, lines 15-24.)

Despite receiving this information, Plaintiff claims he did

not realize that the person asking him these questions was a
police officer, but does acknowledge that the individual
attempted to enter the home.  (Exhibit B, p. 28, line 25, and p.
29, lines 1-11.)  Plaintiff contends that Patrolman McGuigan
attempted to push him out of the way as he was closing and
locking his door.  Within seconds thereafter, Plaintiff claims
that he was pepper sprayed by Officer McGuigan, and that Officers
McGuigan and Fox were wrestling him and trying to get him to put
his arms behind him.  (Exhibit B, p. 36, lines 4-25, and p. 37,
lines 1-14.)  As the three men struggled, Plaintiff admits that
he heard communications on the portable radio of Officer
McGuigan.  (Exhibit B, p. 35, lines 8-25, and p. 36, lines 1-3.)
Despite clearly realizing at that point that the individuals on
his porch were police officers, Plaintiff continued to struggle
against the officers.  (Exhibit B, p. 37, lines 7-24.)  Plaintiff
alleges that the entire incident took about 30 seconds, he was
handcuffed, and then placed in the SUV.  (Exhibit B, p. 36, lines
4-19; p. 37, line 25; and p. 38, lines 1-9.)

     Officer McGuigan, in his Investigation Report, sets forth a
different version of events.  He states that upon arriving at 131
Bridgeton Avenue he spoke briefly with Aaron Wilson, who advised
that his mother, Brenda Wilson, and Gerone Wright had been
arguing, and that he thought that Plaintiff had slapped her.
(Exhibit E.) At that point, both Officers McGuigan and Fox went

to the porch and spoke with Mr. Wright.  Officer McGuigan asked Plaintiff to identify himself, which he did.  (Exhibit E.)  The officer then advised Plaintiff that the police had received a complaint of domestic violence for this address, and asked him if Brenda Wilson was in the house.  Plaintiff responded that she was.  (Exhibit E.)  The officer then told Plaintiff that he wanted to speak with Brenda in order to investigate the reported domestic assault.  Plaintiff refused to allow the officers to speak with Ms. Wilson.  (Exhibit E.)  At that point, Officer McGuigan then advised Plaintiff that he was going to enter the home to check on Ms. Wilson.  He began to open the door, and Plaintiff blocked the officer's entrance into the home.  (Exhibit E.)  Plaintiff was asked to move away from the doorway three times, but refused.  (Exhibit E.)  At that point Plaintiff was told that if he did not move out of the way, he would be arrested.  (Exhibit E.)  Plaintiff again refused, and was advised that he was under arrest for obstructing justice.  (Exhibit E.)  Plaintiff physically resisted arrest, and the two officers had to struggle with him and sprayed him with pepper spray in order to place him in handcuffs.  (Exhibit E.)  After Plaintiff was handcuffed, Officer McGuigan went into the house and spoke with Brenda Wilson, who advised that she had not been assaulted by Mr. Wright.  (Exhibit E.)

Plaintiff was transported to the Bridgeton City Police

6

Department.  As the officers were ushering him into the Police
Department, Plaintiff claims that he wrestled free and threw
himself face down in a snowmound to wash out his eyes.  (Exhibit
B, p. 40, lines 12-20.)  Plaintiff admits that when he was taken
inside the building he was asked if he wanted to wash his eyes
out in the bathroom, and in fact did so.  (Exhibit B, p. 41,
lines 2-6.)  Plaintiff was charged with resisting arrest,
N.J.S.A. 2C:29-2A(3)(a), and obstruction of justice, N.J.S.A.
2C:29-1(a). (See Complaint/Warrants issued against Gerone Wright
on January 22, 2005, Exhibit F.)  The Complaints against
Plaintiff were listed numerous times for trial, but the trial was
repeatedly adjourned at the request of Plaintiff's counsel or the
prosecutor, and eventually the complaints were dismissed in or
about April of 2006. (See records of Bridgeton Municipal Court,
Exhibit G.)

    While being processed at the Bridgeton City Police
Department on January 22, 2005, Plaintiff made a Complaint
against the officers. (See Bridgeton Police Department Internal
Complaint/Comment signed by Gerone Wright, and dated January 22,
2005, Exhibit H.) The Complaint's description of incident is as
follows:

> Officers responded to a reported domestic
> violence. Upon their arrival, Jerome Wright
> was at the door and told the officers they
> could not come into his house. Mr. Wright
> stated he attempted to close the door and the
> officers sprayed him with pepper spray and

arrested him for no reason.
(Exhibit H.)

The Complaint was investigated by Sgt. Michael Pastirko, who had also responded to the call of domestic violence at 131 Bridgeton Avenue, but arrived after Plaintiff had been arrested. Sgt. Pastirko, after questioning Aaron and Azure Wilson as to what they observed of the arrest, concluded that "the officers used the only force necessary to effect a lawful arrest." (See Bridgeton Police Department Internal Investigation, Exhibit I.) Plaintiff was advised of the results of the Police Department's investigation via letter. (See correspondence from the Bridgeton Police Department Internal Affairs Unit to Gerone Wright, Exhibit J.) Plaintiff contends that as a result of being subjected to the pepper spray he suffered injury to his eyes. On January 24, 2005, he underwent an eye exam with Dr. Eugene Frank of Ultimate Eye Care. (Exhibit B, p. 43, lines 1-25.) Plaintiff alleges that Dr. Frank told him that he had a severe infection in his eyes, and that the doctor referred him to a specialist. (Exhibit B, p. 45, lines 5-15.) Dr. Frank, on the other hand, found that there were no abnormalities. (See Dr. Frank's records regarding his examination of Plaintiff, Exhibit K.)

On September 26, 2006, Plaintiff wrote to Dr. Frank to express his frustration in not receiving a report from him regarding the eye exam of January 24, 2005. (See Plaintiff's

correspondence to Dr. Eugene Fran, dated September 26, 2006,

Exhibit L.)  In response, Dr. Frank wrote to Plaintiff under

cover of letter dated October 9, 2006, and stated:

> Your letter also states that you came to my
> office to obtain a copy of your records
> relating to a January 24 visit. When I saw
> you, you did not request a copy of your
> records. Instead, you requested that I
> prepare a report, which I did. My report
> accurately summarizes my examination findings.
> Finally, your letter states that I recommended
> that you see a specialist. This is not
> correct. I told you to return to my office
> for a follow-up examination. You, however,
> chose not to return.

(See Dr. Frank's correspondence of October 9, 2006, Exhibit M.)

IV.  **DISCUSSION**

    A.  **Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied

that "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.

P. 56(c).

Initially, the moving party has the burden of demonstrating

the absence of a genuine issue of material fact.  Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has

met this burden, the nonmoving party must identify, by affidavits

or otherwise, specific facts showing that there is a genuine

issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

In circumstances where a nonmoving party fails to oppose the motion, Fed. R. Civ. P. 56(e) provides that the court may only grant the moving party's motion for summary judgment "if appropriate."  A moving party's motion is appropriately granted when that party is entitled to judgment as a matter of law, and the court "will accept as true all material facts set forth by the moving party with appropriate record support."  See Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990).

**B.  Analysis**

Plaintiff's Complaint can be construed as asserting two categories of claims, one arising under the constitution and the other arising under state law.[2]  Specifically, Plaintiff's

---

[2]Plaintiff has asserted a claim under the New Jersey Constitution for a violation of his right to "enjoy and defend life and liberty, and to pursue and obtain safety and happiness." (Compl. ¶ 9.)  This is not a cognizable claim.  Because, however, Plaintiff has also brought a claim pursuant to 42 U.S.C. § 1983 for violations of his Fourth Amendment right to be free from unreasonable search and seizure and false arrest, and the New

Complaint alleges: 1) a violation of his constitutional rights for unreasonable seizure,[3] excessive force, and false arrest; and 2) negligence and assault and battery.

### 1.   Plaintiff's constitutional claims

Plaintiff claims that his constitutional rights were violated when Officers McGuigan and Fox unreasonably seized him, used excessive force in effecting his arrest, and falsely arrested him.  Plaintiff also claims that the City of Bridgeton and the City of Bridgeton Police Department failed to properly train and supervise Officers McGuigan and Fox.

### a.   *Claims against Officers McGuigan and Fox*

The qualified immunity analysis provides the basis to determine whether a claim for a constitutional violation by a law enforcement officer is viable.  The standard promulgated by the Third Circuit is as follows:

> Qualified immunity protects law enforcement
> officers from being tried for actions taken in the

---

Jersey constitution provides identical protection, <u>see</u> N.J. Const. of 1947, art. I, para. 7, the Court will construe Plaintiff's state constitutional claim as asserting a violation of Article I, Paragraph 7.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 107 (1976) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.").  Additionally, because the federal and state constitutions provide the same protections on this issue, a separate analysis for Plaintiff's state constitutional claim is unnecessary.

[3]Plaintiff's Complaint can be construed as asserting a claim for an unreasonable seizure, but none of Plaintiff's claims appear to raise a claim for a unreasonable search.

course of their duties.  If the immunity applies,
it entitles the officer to be free of the 'burdens
of litigation.' But the immunity is forfeited if
an officer's conduct violates 'clearly established
statutory or constitutional rights of which a
reasonable person would have known.' To determine
... whether the officers have lost their immunity,
we must engage in a two step analysis. First, we
must decide 'whether a constitutional right would
have been violated on the facts alleged . . . .'
... Second, if we believe that a constitutional
violation did occur, we must consider whether the
right was "clearly established."  The question is
'whether it would be clear to a reasonable officer
that his conduct was unlawful in the situation he
confronted.' This is an objective inquiry, to be
decided by the court as a matter of law.

Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004) (citations

omitted).  Thus, in order to determine whether Plaintiff's claims

against the officers are viable, it must first be determined

whether the officers violated Plaintiff's constitutional rights.

First, Plaintiff claims that he was unreasonable seized by

Officers McGuigan and Fox.  Even though it is unclear exactly

what part of the incident Plaintiff claims constitutes an

unreasonable seizure, the Court will construe Plaintiff's

unreasonable seizure claim to cover the time between the

officers' arrival on the scene and Plaintiff's arrest.

The United States Supreme Court has explained the analysis

of a Fourth Amendment claim for unreasonable seizure:

The Fourth Amendment prohibits "unreasonable
searches and seizures" by the Government . . . .
Because the "balance between the public interest and
the individual's right to personal security[]" tilts in
favor of a standard less than probable cause in such

12

cases, the Fourth Amendment is satisfied if the
officer's action is supported by reasonable suspicion
to believe that criminal activity " 'may be afoot.'

When discussing how reviewing courts should make
reasonable-suspicion determinations, we have said
repeatedly that they must look at the "totality of the
circumstances" of each case to see whether the
detaining officer has a "particularized and objective
basis" for suspecting legal wrongdoing. This process
allows officers to draw on their own experience and
specialized training to make inferences from and
deductions about the cumulative information available
to them that "might well elude an untrained person."
Although an officer's reliance on a mere "'hunch'" is
insufficient to justify a stop, the likelihood of
criminal activity need not rise to the level required
for probable cause, and it falls considerably short of
satisfying a preponderance of the evidence standard.

Our cases have recognized that the concept of
reasonable suspicion is somewhat abstract. But we have
deliberately avoided reducing it to " 'a neat set of
legal rules[].'"

U.S. v. Arvizu, 534 U.S. 266, 273-274 (2002) (internal quotations

and citations omitted).

The undisputed facts demonstrate that Officers McGuigan and

Fox had reasonable suspicion to believe that criminal activity

was afoot at the Wilson residence, and that it was proper for the

officers to "seize" Plaintiff prior to his arrest.  When the

officers arrived at the Wilson residence, it was pursuant to an

emergency 911 call from Ms. Wilson's son, who informed

dispatchers that Plaintiff--Gerone Wright–had hit his mother at

his house at 131 Bridgeton Avenue.  In responding to this

domestic violence incident occurring at 131 Bridgeton Avenue, the

officers encountered Plaintiff on the porch of that residence.
Officer McGuigan asked Plaintiff his name, and Plaintiff
responded that he was Gerone Wright.  Based on the fact that a
911 call identified "Gerone Wright" as the perpetrator of
domestic violence incident at 131 Bridgeton Avenue, and the
officers encountered Gerone Wright at that address, the officers
had a "particularized and objective basis" for suspecting
wrongdoing.  Thus, Officer McGuigan's "seizure" of Plaintiff
prior to his arrest does not amount to a constitutional
violation.

Second, Plaintiff claims that the officers used excessive
force on him while effecting his arrest.  In determining whether
excessive force was used during an arrest, an "objective
reasonableness" test is applied.  Sharrar v. Felsing, 128 F.3d
810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S.
386, 396 (1989)).  The objective reasonableness test "requires
careful attention to the facts and circumstances of each
particular case, including the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of
the officers or others, and whether he is actively resisting
arrest or attempting to evade arrest by flight."  Id. (relying on
Graham, 490 U.S. at 396; Groman v. Township of Manalapan, 47 F.3d
628, 634 (3d Cir. 1995)).  In evaluating the proper test for
objective reasonableness, the Supreme Court has provided that

14

"not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396 (1989)(citation omitted).  Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  Id.

Here, Officers McGuigan and Fox were objectively reasonable in using force in effecting Plaintiff's arrest.  It is undisputed that Plaintiff did not allow the officers to enter the residence in order for them to check on Ms. Wilson and to further investigate the domestic violence assault.[4]  Because he would not move away from the door as requested by the officers, Plaintiff was told that he was being arrested.  Plaintiff concedes that he struggled with the officers, and then officers sprayed him with pepper spray.  Plaintiff also concedes that the entire incident lasted about thirty seconds.

---

[4]Plaintiff appears to contend that he did not know that Officers McGuigan and Fox were police officers.  Other than his own testimony, Plaintiff has not provided any evidence to support the reasonableness of this contention.  Plaintiff concedes that Officer McGuigan told Plaintiff that he had received a call stating that there was a problem at the residence, Plaintiff answered questions posed to him by Officer McGuigan, and then he heard a transmission from Officer McGuigan's police radio.  These facts do not support the contention that Plaintiff did not know that McGuigan and Fox were police officers.

The circumstances of this case demonstrate that the officers' use of physical and chemical force was reasonable because (1) the crime at issue--domestic violence assault reportedly perpetrated by Plaintiff--was severe, (2) Plaintiff appeared to pose an immediate threat to the safety of the officers and to Ms. Wilson, and (3) Plaintiff was actively resisting arrest.  Indeed, had the officers not arrested Plaintiff in order to enter the residence to check on the alleged victim of domestic violence, they would have been derelict in their duties as police officers.  See State v. Holloway, 2005 WL 2363041, *1 (N.J. Super. Ct. App. Div. Sept. 28, 2005) (citing State v. Frankel, 847 A.2d 561 (N.J. 2004)) (holding that the "emergency aid doctrine" is an exception to the warrant requirement allowing an officer to enter a home to investigate a domestic violence call); see also State v. Cassidy, 843 A.2d 1132, 1138 (N.J. 2004) (stating that "courts have recognized that the right of police officers to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law").

Further, the use of pepper spray to effect the arrest of Plaintiff was not unreasonable under the circumstances.  See Davis v. Township of Paulsboro, 421 F. Supp. 2d 835, 855 (D.N.J. 2006) (holding that an officer spraying the plaintiff once was

16

reasonable under the circumstances because the plaintiff posed an immediate threat to the officer and possibly others in the house); see also Tofano v. Reidel, 61 F. Supp. 2d 289, 301 (D.N.J. 1999) (officers' attempts to subdue arrestee with pepper spray were reasonable when arrestee was actively resisting arrest); Mitchell v. Yeadon Borough, No. 01-1203, 2002 WL 265021 at *4 (E.D. Pa. Feb. 22, 2002) (use of pepper spray was reasonable when arrestee was "yelling and screaming and cursing" and snatched his arm away from the arresting officer); Modugno v. Pa. State Police, No. 00-3312, 2001 WL 1382279 at *4 (E.D. Pa. Nov. 6, 2001) (use of mace was reasonable when arrestee was "sprayed only after he repeatedly refused to comply with [the officer's] verbal and physical attempts to get him to cooperate").  Consequently, Officers McGuigan and Fox did not use excessive force in arresting Plaintiff.

Finally, Plaintiff claims that he was falsely arrested.  A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.  Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004).  Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.  Id.; see also  Wright v. City of Philadelphia, 409 F.3d 595, 601 (3d Cir. 2005) (stating that in order to determine

17

whether an arrest is valid, the Court must look to the law of the state where the arrest took place).

Plaintiff was charged with resisting arrest, N.J.S.A 2C:29-2a(3)(a), and obstruction of justice, N.J.S.A. 2C:29-1(a), which provide, respectively:

> Resisting arrest; eluding officer
> a. (1) Except as provided in paragraph (3), a person is guilty of a disorderly persons offense if he purposely prevents or attempts to prevent a law enforcement officer from effecting an arrest . (2) Except as provided in paragraph (3), a person is guilty of a crime of the fourth degree if he, by flight, purposely prevents or attempts to prevent a law enforcement officer from effecting an arrest. (3) An offense under paragraph (1) or (2) of subsection a. is a crime of the third degree if the person:
> (a) Uses or threatens to use physical force or violence against the law enforcement officer or another; or
> (b) Uses any other means to create a substantial risk of causing physical injury to the public servant or another.
>
> Obstructing administration of law or other governmental function
> a. A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act. . . .

It is clear that the officers had probable cause to arrest Plaintiff for these violations.  The facts known to the officers at the time of Plaintiff's arrest were that they had received a report of a domestic violence assault involving Ms. Wilson and

Plaintiff at Ms. Wilson's residence, and Plaintiff refused to allow them into the house in order to check on Ms. Wilson's welfare and to further investigate the incident.  The officers also knew that Plaintiff struggled with them and refused to be arrested and handcuffed, to the extent that pepper spray had to be utilized.  These facts provided the officers with probable cause to believe that Plaintiff was committing these criminal offenses.[5]

Consequently, because Officers McGuigan and Fox did not violate Plaintiff's Fourth Amendment rights, they are entitled to summary judgment on Plaintiff's constitutional violation claims against them.

### b.  *Plaintiff's claims against the City of Bridgeton and the City of Bridgeton Police Department*

Plaintiff claims that the City of Bridgeton and the City of Bridgeton Police Department failed to properly train and supervise Officers McGuigan and Fox.  Plaintiff has brought this claim pursuant to 42 U.S.C. § 1983.

As a primary matter, a municipality and its police department are a single entity for the purposes of § 1983 liability.  Boneberger v. Plymouth Township, 132 F.3d 20, 25 n.4 (3d Cir. 1997).  Liability under § 1983 may be imposed on

---

[5]It is of no consequence to the probable cause analysis that Ms. Wilson stated that she had not been assaulted by Plaintiff, or that Plaintiff's charges were ultimately dropped.  See Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004).

municipalities where acts of the government employee are deemed to be the result of a policy or custom of the municipality for whom the employee works.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978); Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).  In cases where the plaintiff alleges that the municipality failed to properly train the employee, the municipality can be liable under § 1983 if the failure to train constitutes "deliberate indifference" to the rights of persons with whom the police come into contact; mere negligence to adequately train is not enough. Malignaggi v. County of Gloucester, 855 F. Supp 74, 7 7(D.N.J. 1994).  Generally, "where a plaintiff seeks to establish liability based on a supervisor's (or municipality's) failure to train or supervise adequately, the plaintiff must show that a need for more or different training or supervision is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train or supervise can fairly be said to represent official policy."  Calhoun v. Vicari, No. 05-4167, 2005 WL 2372870, at *3 (D.N.J. Sept. 26, 2005)(relying on City of Canton v. Harris, 489 U.S. 378, 388-92 (1989)).

In order to bring a claim of failure to train, a plaintiff must: "(1) identify the deficiency; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency reflected deliberate

indifference on the part of the municipality." <u>Malignaggi</u>, 855
F. at 77 (citing <u>Canton</u>, 489 U.S. at 391; <u>Colburn v. Upper Darby
Township</u>, 946 F.2d 1017 (3d Cir. 1991)).

Here, Plaintiff has not identified any policy or custom of
the City to support Plaintiff's contention that Officers McGuigan
and Fox were improperly trained and supervised, and he has not
shown any constitutional violation.  Consequently, the City of
Bridgeton and the City of Bridgeton Police Department are
entitled to summary judgment on Plaintiff's constitutional claim
against them.

### 2.   Plaintiff's state law claims

Plaintiff claims that Officers McGuigan and Fox were
negligent and committed assault and battery against him.
Plaintiff also contends that the City of Bridgeton and the City
of Bridgeton Police Department are vicariously liable for the
officers' negligence.  Defendants have moved for summary judgment
on these state law claims because Plaintiff has failed to comply
with the New Jersey Tort Claims Act (NJTCA).

The NJTCA provides, "No action shall be brought against a
public entity or public employee under this Act unless the claim
upon which it is based shall have been presented in accordance
with the procedures set forth in this chapter."  N.J.S.A. 59:8-3.
A tort claim notice "must be served upon the public entity within
90 days of the accrual of the claim, and failure to do so will

forever bar the claimant from recovering against a public entity or public employee." N.J.S.A. 59:8-8. The requirement to serve a tort claim notice applies to claims based on negligence, as well as intentional torts. See <u>Velez v. City of Jersey City</u>, 850 A.2d 1238, 1239 (N.J. 2003).

Plaintiff never served Defendants with a tort claims notice. Accordingly, his state law claims must fail.

**V.   <u>CONCLUSION</u>**

For the reasons expressed above, Defendants are entitled to summary judgment on all of Plaintiff's claims against them. An appropriate Order will issue.


Dated: August 8, 2007                          s/ Noel L. Hillman

At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.